**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **KENNETH W. MOORE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:10-0141** |
| | ) | **Judge Sharp** |
| **CITY OF CLARKSVILLE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

In this employment action brought under Title VII, 42 U.S.C. 2000e, *et seq.*, 42 U.S.C. §
1983, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.*,
Defendant City of Clarksville has filed a Motion for Summary Judgment (Docket No. 32), to which
Plaintiff, Kenneth W. Moore, has responded in opposition (Docket No. 50), and Defendant has
replied (Docket No. 59). For the following reasons, the Motion for Summary Judgment will be
granted in part and denied in part.

**I. FACTUAL BACKGROUND**

Despite almost one hundred pages of briefing, and an almost identical number of paragraphs
of "undisputed" material facts identified by the parties, this is a relatively straight-forward retaliation
and hostile work environment case. Indeed, the relevant facts may be set forth in a handful of pages.
Construed in Plaintiff's favor, those facts are as follows:

Plaintiff, a white male, was employed as a police officer with the Clarksville Police
Department from March 5, 1989, until he was terminated on July 21, 2008. During his more than

nineteen years of service, Plaintiff had different job responsibilities, received pay raises, and had an insignificant disciplinary history.

On June 10, 2006, Plaintiff married Patti Morris ("Mrs. Morris"), a fellow Clarksville police officer who began working for the department in 1998, and served with the canine unit. In November of 2006, she filed an employment discrimination complaint against the department in state court alleging retaliation, discrimination, malicious harassment, and failure to promote.

Subsequently, in August 2007, Mrs. Morris was investigated for failing to properly control her police dog which resulted in another officer being bitten. In the course of the investigation, it was revealed that she had covertly recorded Sergeant Bert Clinard in violation of a Memorandum from then-Chief Mark Smith. While Mrs. Morris admitted recording Sergeant Clinard, she denied recording any other officers. Mrs. Morris received a ten day suspension for the surreptitious recording and was removed from the canine unit for failing to control her dog.

During an internal appeal of her suspension, it was discovered that Mrs. Morris had, in fact, recorded other members of the police department. The internal appeals board recommended termination. Chief Alonzo Ansley determined Mrs. Morris had been untruthful by denying that she had recorded anyone other than Sgt. Clinard, and terminated her employment on September 18, 2007. Subsequently, the City's appeals board affirmed Mrs. Morris' termination for untruthfulness. Mrs. Moore then filed a charge of discrimination with the EEOC on February 15, 2008, in which she alleged sex and age discrimination, as well as retaliation.

Approximately four months later, a City Council meeting was scheduled at City Hall on June 26, 2008. On his way home from work at the end of his shift that day, Plaintiff, while in uniform, drove the approximately 1/8 mile from police headquarters to City Hall in his patrol vehicle.

Plaintiff stopped at City Hall and, with his own camera, took pictures of several police vehicles which were parked in the parking lot. Plaintiff did so because he believed that the officers who drove the vehicles to City Hall had violated a Memorandum from Chief of Police Ansley dated April 7, 2008, which stated:

> Until further notice, use of police vehicles will only be allowed while on duty. No officer will be able to drive their city vehicle to any location for personal business while off duty. Everyone is affected by this, to include command staff and all on-call personnel.

(Docket No. 33-3).

In taking the photographs, Plaintiff had no intention of reporting the alleged violation of the Memorandum. Rather, he took the pictures as leverage in case he ever found himself subject to a disciplinary action.[1]

Unbeknownst to Plaintiff, a local resident observed Plaintiff taking the photographs and reported the same to the Mayor's office which, in turn, forwarded the complaint to the Clarksville Police Department, prompting an internal investigation. Ultimately, Plaintiff was charged with violating General Order B-3 Rule 40 and City Code section 1-1317(11).

The pertinent General Order provides:

> Personnel shall not withhold any information that they may have on any criminal activity, violations of rules or regulations, or internal investigations. Personnel shall not undertake self-assigned criminal or internal investigations at any time.

---

[1] Plaintiff claims he was concerned about retaliation because the Clarksville Police Department had been the subject of numerous discrimination suits in the past. Before Mrs. Morris filed her complaint in state court, she and Plaintiff discussed the possible ramifications, and Plaintiff spoke with other officers who had sued the Department in the past.

The City Code provides that discipline may be imposed for "violation of rules and regulations of the department or any other failure of good behavior which reflects discredit upon an employee, the department, or the city government." (Docket No. 55-1 at 29).

During a pre-decision hearing on July 18 and 21, 2008, Plaintiff admitted he was not going to inform any superior about the pictures unless, and until, somebody accused him of wrongdoing. Plaintiff stated that he believed people "were out to get him," although he conceded that "the staff here has never actually done anything to me," and admitted that he had received no unwarranted discipline because of his wife's lawsuit.

In the course of the hearing, Plaintiff was also asked by Chief Ansley whether he had ever conducted any other "self-assigned investigation" of a City employee and he answered, "no." When specifically asked about whether he obtained information from a fellow officer about then-Mayor Johnny Piper, Plaintiff responded that he had, but that he thought the Chief's inquiry related to investigation of fellow police officers. At the conclusion of the hearing, Chief Ansley stated:

> Officer Moore I had the weekend to think about this. I don't take making these decisions lightly. You can believe that. Anytime I make decisions like these it bothers me. I don't let personal feelings come into these decisions. Ah, I'm gonna ask you what, what I have to base my decision on is the fact that you said you were trying to gather information on the Mayor to enhance or further your, your wife's lawsuit. I have a big problem with that. I really do. Plus the fact that you were taking pictures of other officer's cars - for whatever reason. It's my opinion that possibly you were using that also for that reason.
>
> *                            *                            *
>
> But yet you find to take it upon yourself to take pictures of other people's, other officer's patrol cars – which I think is deceitful. It's undermining this department, it causes morale problems. Just like covertly recording somebody in a parking lot, trying to gain information for whatever reason. I believe that's why you also took these pictures, for whatever reason in your mind to try to help ah, promote that lawsuit. That's my opinion. And you even said that you've done that in the case of the Mayor. You, you're not understanding that the ah, the ah, seriousness of this.

4

(Docket No. 33-2 at 21-22).

Notwithstanding Deputy Chief Frank Gray's recommendation that Plaintiff be suspended without pay for five days, Chief Ansley terminated Plaintiff's employment ostensibly because Plaintiff conducted a "self-investigation" in violation of General Order B-3 Rule 40, and City Code Section 1-1317 (11), which requires that departmental rules be followed. Plaintiff was provided the opportunity to appeal the decision, but did not allow the hearing board to go forward once he learned that Councilman Doyle, who sat on the board which affirmed Mrs. Morris' termination, was also scheduled to sit on Plaintiff's board, and Councilman Doyle refused to recuse himself.

After his termination, Plaintiff timely filed a charge with the EEOC. He then filed suit in this Court.

## II. APPLICATION OF LAW

The standards governing motions for summary judgment are well-known and need not be repeated in detail. A party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

In his Complaint, Plaintiff indicates that this is an action brought under Title VII, 42 U.S.C. § 1983, and the THRA for "damages suffered as a result of Defendant's discriminatory actions with

regard to wrongful termination." (Docket No. 1, Complaint ¶ 1) While the Complaint contains language about "color of state law," "discriminatory practices," "hostile work environment," "emotional distress," "disparate treatment," and "disparate impact," (id. ¶¶ 10-13), Plaintiff has made clear in his response that he is seeking to recover compensatory and punitive damages, attorney's fees, and unspecified equitable relief, on the theory that he was subjected to retaliation by association and a hostile work environment under Title VII and the THRA. The Court, therefore, addresses the parties' arguments in the context of those claims.

## A. Retaliation

In the absence of direct evidence, retaliation claims are subject to analysis under the familiar McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) burden-shifting framework.[2] Plaintiff has the initial burden of establishing the following essential elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two – that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999). "If the plaintiff demonstrates a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." Virts v. Consol. Freightways Corp., 285 F.3d 508, 521 (6th Cir. 2002). "Once the defendant articulates its reason, the plaintiff,

---

[2] As a general rule, "THRA claims are analyzed in the same manner as claims brought under Title VII of the Civil Rights Act of 1964." Marpaka v. Hefner, 289 S.W.3d 308, 313 (Tenn. Ct. App. 2008). However, because the Tennessee Supreme Court recently held that common law retaliation claims are not subject to the McDonnell Douglas analysis for purposes of summary judgment review by state court, it is unclear whether the same would hold true with regard to review by federal courts and/or retaliation claims under the THRA. Ultimately, this is of no significance since Plaintiff has set forth enough evidence to survive summary judgment under the more stringent McDonnell Douglas criteria.

who bears the burden of persuasion throughout the entire process, must demonstrate that the proffered reason was a mere pretext for discrimination." Id.

In this case, the parties appear to agree that Defendant has articulated a legitimate, non-discriminatory reason for Plaintiff's termination. They differ, however, on whether Plaintiff has set forth sufficient evidence to establish a *prima facie* case, and whether he can show that the stated reason for termination – conducting a "self-investigation" – was a pretext for termination.

Turning to the *prima facie* case, Plaintiff has set out a cognizable claim for retaliation by association. As the Supreme Court recently explained, "Title VII's antiretaliation provision must be construed to cover a broad range of employer conduct," and encompasses "any employer action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Thompson v. North American Stainless, LP, 131 S.Ct. 863, 868 (2011) (quoting, Burlington N. & S. F.R. Co. v. White, 126 S.Ct. 2405, 2415 (2006)). Although the Supreme Court in Thompson "decline[d] to identify a fixed class of relationships for which third-party reprisals are unlawful," the Court found "it obvious that a reasonable worker might be dissuaded from engaging in protected activity if she knew her fiancé would be fired," and observed "that firing a close family member will almost always meet the Burlington standard[.]" Id.

Here, Plaintiff was protected under Title VII's retaliation provision because his wife had pursued claims under Title VII, and Defendant does not argue otherwise insofar as Plaintiff's claim is based upon a third-party reprisal/association theory. Nor does Defendant argue that Plaintiff did not suffer an adverse employment action, so as to satisfy the second element of a *prima facie* case. Rather, Defendant claims that Plaintiff cannot meet his initial burden of establishing a causal connection between the adverse action and Mrs. Morris' protected activity.

In this regard, Defendant argues that "[t]he Sixth Circuit has held that anything over six

months is generally insufficient, standing alone, to establish a causal connection." (Docket No. 34-1

at 22, collecting cases). Because more than a year and a half passed between the time that Mrs.

Morris filed her complaint in November 2006 and Plaintiff's termination in July 2008, Defendant

argues that Plaintiff cannot show a temporal proximity between those two events.

In advancing this argument, however, Defendant fails to consider that Mrs. Morris filed an

EEOC charge on February 18, 2008, which, itself, was a protected activity. Niswander v. Cincinnati

Ins. Co., 529 F.3d 713, 721 (6th Cir. 2008). That filing was a little over five months before

Plaintiff's termination, bringing it within the sixth month window for temporal proximity recognized

by the Sixth Circuit. See, Vereecke v. Huron Valley Sch. Dist., 609 F.3d 392, 401 (6th Cir. 2010)

(noting that causal connection may be based upon close proximity of time which is "usually less

than six months").

Regardless, Plaintiff is not relying solely upon temporal proximity to establish the causal

connection. Rather, he identifies other police officers who, he claims, were "similarly situated," but

were treated less harshly by Chief Ansley for greater infractions of departmental rules. See, Nguyen

v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000) ("evidence that a defendant treated the

plaintiff differently from similarly situated employees . . . is relevant to causation"). Specifically,

Plaintiff points to the following individuals and the charges they were accused of:

> 1. Ivan Szczerbiak was investigated for having a romantic relationship with a minor
> he met while an advisor in the department's Explorer program. After Szczerbiak was
> cleared of criminal charges by the Tennessee Bureau of Investigation, he was
> investigated by the Public Integrity Unit, and admitted hugging the minor and taking
> her out on dates. Chief Ansley determined that Szczerbiak engaged in improper
> conduct by dating a minor and suspended him for ten days.

2.  Christopher MacMillan, who was married at the time, developed a romantic relationship with a woman he met during an eviction proceeding. He, like Plaintiff, was charged with violating City Ordinance No. 1-13-18(11) by failing to follow the rules and regulations of the police department, but received only a two day suspension for his conduct.

3.  Jeffrey Denault responded to a call at a local bar and, in doing so, operated his police vehicle "without due regard to the safety of the public." Once at the bar, Officer Denault tasered a suspect who apparently had already passed out. He also threatened a female patron by pointing the taser at her. For his actions, he received a ten day suspension and was required to undergo remedial training. Subsequently, Officer Denault initiated a traffic stop and it was determined that he made a disrespectful comment to the occupants of the motor vehicle. He was found to have engaged in abusive treatment of the public, conduct below the standards of the public, and violation of the rules and regulations of the department, but received only a written reprimand.

4.  James Moore threw a city-owned cellphone into the wall in front of several subordinates. He notified his supervisor, but initially denied knowing how the phone came to be broken. While he shortly thereafter admitted breaking the phone, he had prepared a report about the incident but destroyed it out of fear of getting in trouble. Chief Ansley found that Sergeant Moore had been deceitful, and recommended that he be demoted and suspended for six days.

5.  Andy Altman became upset over work assignments and lost his temper while in an office at the police station. He used vulgar language which could be heard outside the office, and threw a clipboard at the wall, breaking it. Although Officer Altman was found to have engaged in unprofessional conduct, had exhibited a lack of self-control and self-discipline, and had recently received counseling about his behavior and his language, he received only a three day suspension.

(Docket No. 56, Exhs. K, L, M, N, O, Q & R).

Defendant argues that none of the foregoing individuals were similar to Plaintiff because the facts surrounding their circumstances were different. Additionally, Defendant asserts the proposed comparators are different because none had been accused of conducting a "self-investigation."

Exact comparators are often hard to come by, and whether any two employees are similarly situated often presents a question of fact for the jury. See, Hawn v. Exec. Jet Mgmt., Inc., 615 F.3d 1151, 1157 (6th Cir. 2010) (ordinarily, the question of whether employees are similarly situated is

for the jury to determine); Mandell v. County of Suffolk., 316 F.3d 368, 379 (2nd Cir. 2003); (same);

George v. Leavitt, 407 F.3d 405, 414 (D.C. Cir. 2005) (same). In fact, it is improper to find that a

plaintiff has failed to establish the fourth element of a *prima facie* case where a reasonable jury

could find that the named comparators were similarly situated. See e.g., Jones v. Potter, 488 F.3d

397, 406 (6th Cir. 2007) (citation omitted) (jury question where "reasonable minds could differ as

to whether a preponderance of the evidence establishes that [plaintiff] was treated more harshly than

similarly situated employees"); Campbell v. Univ. of Akron, 211 Fed Appx. 333, 345-46 (6th Cir.

2006) (district court improperly granted summary judgment where reasonable jury could conclude

that others received less discipline for same or greater infractions).

In Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992), the Sixth Circuit wrote that

"to be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare his/her

treatment must have dealt with the same supervisor, have been subject to the same standards and

have engaged in the same conduct without such differentiating or mitigating circumstances that

would distinguish their conduct or the employer's treatment of them for it." However, that language

in Mitchell should not be read too broadly because later, in Ercegpvoch v. Goodyear Tire & Rubber

Co., 154 F.3d 344 (6th Cir. 1998), the Sixth Circuit observed that Mitchell allows for "different

circumstances," and, therefore, courts "should make an independent determination as to the

relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected

employee." Id. at 352.

For a comparator to be similarly situated then, "an exact correlation is not required by the

law of this circuit." Martin v. Toledo Cardiology Consultants, Inc., 548 F.3d 405, 412 (6th Cir.

2008). Rather, the Sixth Circuit has "held that to be found similarly situated, the plaintiff and his

proposed comparator must have engaged in acts of 'comparable seriousness.'" <u>Wright v. Murray Guard, Inc.</u>, 455 F.3d 702, 710 (6th Cir. 2006).

In this case, there are some obvious dissimilarities between Plaintiff and his proposed comparators. However, a reasonable jury could find that dating an underage girl, intentionally destroying city property, engaging in an adulterous affair, and tasering an unconscious subject and threatening another with the taser, constitute conduct at least as serious as taking pictures of police cars with a personal camera, even if the aim was to conduct a "self-investigation."[3]

Plaintiff's evidence regarding proposed comparators also can be used by a jury to determine that Defendant's stated reason for his termination was a pretext for dismissal. Pretext may be established by "showing that 1) the stated reason had no basis in fact; 2) the stated reason was not the actual reason; or 3) the stated reason was insufficient to explain the defendant's action." <u>Virts v. Consol. Freightways Corp.</u>, 285 F.3d 508, 521 (6th Cir. 2002). If a jury were to determine that the proposed comparators engaged in comparable wrongdoing, but received lesser sanctions, the jury could also decide that Plaintiff's action did not warrant termination, and that the real reason for his termination was that Defendant retaliated against him because of his wife's pursuit of employment claims against the police department.

Moreover, there is additional evidence from which a jury could determine that conducting a "self-investigation" was not the actual reason for Plaintiff's termination. Specifically, during the

---

[3] <u>Armstrong v. Whirlpool Corp.</u>, 363 Fed. Appx. 317 (6th Cir. 2010), upon which Defendant heavily relies, is distinguishable for many reasons, not the least of which is that the plaintiffs in that case concealed documents during the course of litigation. More importantly, the Sixth Circuit found that the connection between the complained-of racial harassment and the violation of company policy (after suit was filed) was "too tenuous to establish a question of fact as to whether [plaintiff's] conduct . . . was insufficient to warrant termination." <u>Id.</u> at 319. Here, a jury could determine that Plaintiff's termination, ostensibly for taking pictures and engaging in a "self-investigation," was not the kind of conduct which warranted termination, given the punishment meted out to the comparators.

11

course of the pre-decision hearing, Chief Ansley made it a point to remark that he had a "big problem" with Plaintiff's action because in his "opinion," Plaintiff may have done so in order to help his wife's lawsuit. A jury could view such remarks as evidencing a retaliatory animus toward Plaintiff for his wife's pursuit of her discrimination and retaliation claims.

Based upon the foregoing, the Court will deny Defendant's Motion for Summary Judgment as it relates to Plaintiff's retaliation claim.

## B. **Hostile Work Environment**

The tripartite burden-shifting mechanism set forth in McDonnell Douglas is also appropriate with respect to hostile work environment claims. Clay v. United Parcel Serv., Inc., 501 F.3d 695, 701 (6th Cir. 2007). Preliminarily, a plaintiff must establish a *prima facie* case by showing (1) protected class status; (2) unwelcome harassment; (3) harassment based upon membership in a protected class; (4) an intimidating, hostile or offensive work environment because of the harassment; and (5) employer liability. See, Id. at 607. Only if that burden is met does the burden of production shift to the defendant to articulate a legitimate non-discriminatory reason for the employment action, which may then be rebutted by the plaintiff.

Defendant argues that Plaintiff cannot establish the first and fourth prongs of a *prima facie* case. With regard to the first prong, Defendant argues that Plaintiff is not a member of a protected class, and that it is unaware of any cases which recognize "hostile work environment claims not based upon membership in a protected class." (Docket Entry No. 59 at 14). However, the Sixth Circuit has recognized claims for hostile work environment under an association theory, to wit harassment of an employee because of his or her association with a member in a protected class,

Barrett v. Whirlpool Corp., 556 F.3d 502, 515 (6th Cir. 2009), and Mrs. Morris is in the protected class for sex (female), and age (over 40).

Nevertheless, Plaintiff's hostile work environment claim fails because he cannot show unwelcome harassment (element two), or that he was subjected to an intimidating, hostile or offensive work environment because of any alleged harassment (element four). Even if Plaintiff had demonstrated any workplace harassment, which by his own admission does not appear to have existed, in his response brief, Plaintiff merely asserts that "he was concerned that he and/or his [w]ife may be terminated after participating in protected activities, which caused him to be nervous." (Docket No. 50 at 33).

While "Title VII comes into play before the harassing conduct leads to a nervous breakdown." Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993), general angst will not do. Rather, to establish the fourth prong of the *prima facie* case, Plaintiff "must present evidence showing that under the 'totality of the circumstances' the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Clay, 501 F.3d at 707 (citation omitted).

In determining whether Plaintiff has satisfied the "severe or pervasive requirement," the Court looks at the "totality of the circumstances," and considers "'the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance.'" Id. (quoting, Randolph v. Ohio Dep't of Youth Servs., 453 F.3d 724, 733 (6th Cir.2006)). As stated in Randolph:

> A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or

13

pervasive to alter the conditions of the victim's employment and create an abusive working environment." . . . Both an objective and subjective test must be met; in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim.

Randolph, 453 F.3d at 733 (internal citation to Harris omitted).

Upon review of the record in this case, the Court finds no evidence from which a jury could determine that a reasonable person in Plaintiff's circumstances would have found the workplace fraught with intimidation and ridicule which created an abusive working environment. More importantly, Plaintiff has not shown that he, himself, found the workplace to be permeated with offensive conduct or remarks which altered the conditions of his employment. Quite the contrary, during the pre-decision hearing, although Plaintiff claimed that he had at times been treated differently than other officers and felt others were out to "get him," he also specifically stated that "the staff here has never actually done anything to me," that "everyone has always greeted me and I always greet them back," answered in the affirmative when asked whether the department gave him a "good place to work in," and conceded that nobody ever approached him, or said anything about his wife's lawsuit. (Docket No. 33-2 at 2, 18 & 21).

In short, Plaintiff simply has presented insufficient evidence from which a reasonable jury could conclude that he was subjected to a hostile work environment. Accordingly, this claim will be dismissed.

## C. **Punitive Damages**

Plaintiff is pursuing his claims against the City of Clarksville under Title VII and the THRA.[4]
Punitive damages against a municipality under Title VII are prohibited by statute:

---

[4] In his Complaint, Plaintiff mentions 42 U.S.C. § 1983, but it appears that he has abandoned any claim under that statute. In any event, "a municipality is immune from punitive damages under 42 U.S.C. § 1983." City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 272 (1981).

A complaining party may recover punitive damages under this section [42 U.S.C. 2000e-5] against a respondent (*other than a government, government agency, or political subdivision*) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or reckless indifference to the federally protected rights of an aggrieved individual.

42 U.S.C. §1981a(b)(1) (emphasis added). As for claims under the THRA, the Tennessee Supreme Court has held that punitive damages "are available only in cases involving discriminatory housing practices and malicious harassment," Carver v. Citizens Utilities Co., 954 S.W.2d 34, 35 (Tenn. 1997),[5] neither of which is a claim in this case. Accordingly, Plaintiff's punitive damages claim will be dismissed.

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment will be granted with respect to Plaintiff's hostile work environment claim and his request for punitive damages, but denied with respect to Plaintiff's retaliation claim.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

---

[5] Plaintiff's assertion that Washington v. Robertson County, 29 S.W.3d 466, 470 (Tenn. 2000) is authority for an award of punitive damages in this case is incorrect. There, the Tennessee Supreme Court merely stated that Part 7 of the THRA creates a cause of action under the THRA for "malicious harassment," Tenn. Code Ann. 4-21-701, and punitive damages can be awarded for such claims. However, the cause of action for "Employment-Related Discrimination" is found in Part 4, Tenn. Code Ann. §§ 4-21-401 – 408, a different subsection of the THRA, and that section does not allow for punitive damages. See, Carver, 954 S.W.2d at 35 (noting punitive damages are only available for claims under Part 6 and Part 7 of the THRA); Reagan v. City of Knoxville, 692 F. Supp.2d 891, 908 (E.D. Tenn. 2010) (punitive damages not available in employment discrimination claims under the THRA); Beach v. Ingram & Assoc., Inc., 927 F. Supp.2d 255, 260 (M.D. Tenn. 1996) (same).